IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARVEY BROADUS, | ) | Civil Action No.: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PRISON HEALTH SERVICES, INC., | ) | |
| c/o CT CORPORATION SYSTEMS; and | ) | |
| MICHAEL HERBIK, D.O., | ) | JURY TRIAL DEMANDED |
| c/o STATE CORRECTIONAL INSTITUTE | ) | |
| AT FAYETTE, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

This is a medical professional liability action. Plaintiff, Harvey Broadus suffered a gross delay in the diagnosis and treatment of a lower left limb ischemia because the Defendants ignored Plaintiff's physical findings, symptoms and complaints. Plaintiff sues the Defendants under State law theories and for Federal civil rights violations.

## PARTIES AND BACKGROUND

1. Plaintiff Harvey Broadus ("Plaintiff") is an adult individual resident of Pennsylvania who at all times relevant hereto was incarcerated in the State Correctional Institute at Fayette with inmate number CE-7634.

2. Defendant Prison Health Services, Inc. ("PHS") is a corporation organized under the laws of Tennessee with its principal place of business located at 105 West Park Drive, Brentwood, Tennessee 37027, with a registered address for service of process within the

1

Commonwealth at CT Corporation Systems, 116 Pine Street, Suite 320, Harrisburg, PA 17101. It is a citizen of Tennessee.

3. Upon information and belief, Michael Herbik, D.O. ("Defendant Herbik") is an adult individual and a citizen of the Commonwealth of Pennsylvania. At all relevant times Defendant Herbik was employed as a physician and medical director at State Correctional Institute at Fayette ("SCI Fayette"), who by virtue of his authority was vested with the responsibility providing medical care to inmates within the prison where Plaintiff was in custody.

4. Upon information and belief and at all relevant times heretofore, Defendant Herbik was designated as the responsible health authority for SCI Fayette, and was responsible for overseeing and directing the provision of health care in that facility.

## JURISDICTION AND VENUE

5. This court has jurisdiction of plaintiffs federal law claims pursuant to 28 U.S.C. § 1331 and 1343(a)(3), and jurisdiction over plaintiffs state law claims pursuant to principals of pendant and ancillary jurisdiction.

6. Venue is proper in this district pursuant to 28 U.S.C. §1391 because the cause of action upon which the complaint is based arose in Allegheny County, Pennsylvania, which is in the Western District of Pennsylvania.

## OPERATIVE FACTS

7. At all relevant times herein, Plaintiff was an inmate incarcerated in the SCI-Fayette.

8. At all relevant times the Pennsylvania Department of Corrections ("DOC") was responsible for all prisoners incarcerated in SCI Fayette and, as part of that responsibility,

was responsible for the medical care and treatment of inmates, including Plaintiff. By contract, between or among the DOC and/or PHS, PHS undertook responsibility for the medical care and treatment of inmates at SCI Fayette.

9. At all relevant times PHS and Defendant Herbik were obligated to oversee and ensure the performance of periodic comprehensive medical assessments and examinations of all inmates taking account of the age and healthy status of each prisoner. At all relevant times PHS and Defendant Herbik were obligated to ensure the provision of all necessary health care, including preventive, routine, urgent, and emergency care to all prisoners. The purpose of these examinations and care is to discover any potential or existing serious medical condition(s) and to provide any and all necessary medical treatment for such condition(s).

10. At all relevant times, Defendants knew that a prisoner suffering from a serious or potentially life-threatening illness or injury, or from significant pain, should be referred immediately to a qualified medical professional in accordance with written guidelines.

11. At all relevant times, Defendants knew that critical limb ischemia was a limb and life-threatening condition which demanded emergent medical intervention.

12. At all relevant times, Defendants knew that patients with atherosclerosis in association with hypertension and diabetes were at increased risk of developing critical limb ischemia.

13. At all relevant times, Defendants knew that patients with critical limb ischemia present with ischemic rest pain.

14. At all relevant times, Defendants knew that ischemic rest pain typically presents as a burning pain in the foot that occurs while the patient is recumbent but is relieved when the patient returns to a position in which the feet are dependent.

15. At all relevant times, Defendants knew that patients with critical limb ischemia present with tissue loss, which can be ulceration, dry gangrene or wet gangrene, occurring in the lower extremities due to atherosclerotic occlusive disease of the iliac, femoral or popliteal arteries.

16. At all relevant times, Defendants knew that the criteria for diagnosis of critical limb ischemia included either one of the following (1) more than two weeks of recurrent foot pain at rest that requires regular use of analgesics and is associated with an ankle systolic pressure of 50 mm Hg or less, or a toe systolic pressure of 30 mm Hg or less, or (2) a non-healing wound or gangrene of the foot or toes, with similar hemodynamic measurements.

17. At all relevant times, Defendants knew that objective measurement which would establish a diagnosis of critical limb ischemia could be had by the performance of a hand-held Doppler probe and a blood pressure cuff or ankle-brachial index.

18. By September 1, 2014, Defendants knew that Plaintiff was wheelchair-dependent, had a history of atherosclerosis in association with hypertension and diabetes and had a long-standing, non-healing wound on his left foot.

19. On September 1, 2014, Defendants learned that Plaintiff was requesting pain medication for rest pain in his left foot, which was cool to the touch and had only a faint pulse.

20. On September 2, 2014, Plaintiff continued to complain of resting pain in his left foot and his foot was noted to be red, cool to the touch with faint pedal pulses.

21. On September 4, 2014, Plaintiff reported to Defendants that his left foot and left leg was in pain and burning and that it felt, "like the sun."

22. On September 8, 2014, Plaintiff continued to complain of left foot pain and left calf atrophy.

23. On examination by physician's assistant M. George (PA George), Plaintiff was found to have macerated skin between all of the toes of his left foot in association with decreased dorsal pedis pulses and diminished capillary refill in the left foot.

24. PA George knew that Plaintiff's macerated skin between his toes was an ischemic ulceration and/or gangrene, which is why he suspected Plaintiff had an arterial blockage in his left foot.

25. Thereafter, Plaintiff was to have a Doppler performed by a doctor on his left foot.

26. On September 9, 2014, Plaintiff complained of pain in his left foot and leg while elevated. Plaintiff was found to have a "fleeting" pulse in his left foot. Plaintiff's capillary refill could not be checked because of the poor condition of his toes.

27. Plaintiff was also objectively found to have no movement in his left toes.

28. On September 10, 2014, Plaintiff continued to complain to Defendants of pain in his left foot and was noted to continue to await a Doppler of the foot.

29. Despite Plaintiff's documented symptoms - highly suggestive of limb ischemia – from September 1, 2014 through September 10, 2014, Defendants opted to simply monitor Plaintiff's condition.

30. On September 11, 2014, Plaintiff complained to Defendants that it hurt to even move his left foot and he was noted to have zero (0) pulses in his left foot.

31. Later that same day, Defendant Herbik performed a Doppler on Plaintiff's left foot which revealed a complete absence of blood flow in Plaintiff's superficial femoral, posterior tibial, or dorsalis pedis arteries.

32. Dr. Herbik recognized that Plaintiff needed to be evaluated by a vascular surgeon as soon as possible and noted as much in Plaintiff's medical record.

33. Despite Plaintiff's recognized emergent condition of a complete lack of blood flow in multiple arteries of his left leg and foot, Dr. Herbik chose to schedule Plaintiff's vascular consultation for six (6) days later on September 18, 2014.

34. Plaintiff continued to complain of left foot pain over the next several days.

35. On September 17, 2014, Defendant Herbik evaluated Plaintiff and noted that Plaintiff's foot was still painful and that Plaintiff's left great toe now appeared mottled.

36. Defendant Herbik assessed Plaintiff as suffering from an arterial occlusion with an increased temperature and ordered that Plaintiff be transported to UPMC Shadyside hospital.

37. In the afternoon of September 17, 2014, Plaintiff was transported to UPMC Shadyside where he was found to have a complete absence of any femoral, popliteal, dorsalis, or posterior tibial pulses.

38. Additionally, Plaintiff was found to have lost all plantar flexion, dorsiflexion/extension motor function in his left foot. Plaintiff had also lost all feeling in his left foot.

39. On September 18, 2014, Plaintiff was evaluated by vascular surgeon Michael Singh, M.D.

40. Dr. Singh concluded that Plaintiff had a three month history of chronic aorto-iliac occlusion with rest pain, left foot tissue loss for more than three weeks and an insensate left ankle with no range of motion due to peripheral arterial disease.

41. Dr. Singh concluded that Plaintiff would likely require a below the knee amputation before his discharge, "due to chronic nerve damage from prolonged ischemia."

42. On September 23, 2014, in an effort to save Plaintiff's left leg, Dr. Singh performed an aorto femoral bypass graft upon Plaintiff.

43. Unfortunately, this surgery was unsuccessful and on September 30, 2014, Dr. Singh removed Plaintiff's left leg with a below the knee amputation.

44. The acts of the Defendants herein were undertaken with the purpose and the intent of depriving Plaintiff of his rights under the Eighth and Fourteenth Amendments to United States Constitution and his rights to Due Process and to be free from cruel and unusual punishment.

45. PHS, at all times relevant hereto, had a policy and/or custom of acquiescing in unconstitutional practices in these circumstances which thoroughly corrupted the medical system within SCI Fayette and allowed these constitutional abuses to occur as alleged herein.

46. Furthermore, PHS, at all times relevant hereto, had a policy and/or custom of inadequate response to, and investigation of, citizen complaints and ineffective and inadequate discipline of offending officers/officials and medical staff which thoroughly

corrupted the medical system within SCI Fayette and allowed the constitutional abuses to occur as alleged herein.

47. In addition, by failing to adequately train and/or supervise the officers/officials and medical staff named herein, PHS enhanced and created the danger that Plaintiff would suffer the harm he suffered, and the risk of these constitutional violations suffered by the Plaintiff would have been eliminated, or minimized, by proper training and supervision.

48. The Defendants knew or should have known that they lacked the competence necessary for the performance of their duty to provide care and treatment for inmates' medical needs, and were recklessly indifferent in failing to undertake these responsibilities, as well as intentionally indifferent in failing to perform their responsibilities to maintain and preserve Plaintiff's health.

49. Defendants did nothing to adequately alter the grossly inadequate medical care being administered at SCI Fayette. They allowed the prison medical facility to operate in a manner which perpetuated grossly inappropriate medical care.

50. The above alleged acts of all Defendants and their agents, and a complete failure to provide any positive medical treatment for Plaintiff as he suffered a severe and preventable injury which resulted and will continue to result in pain and suffering, constitute cruel and unusual punishment and violate the Eighth and Fourteenth Amendments to the United States Constitution.

51. The above alleged acts of Defendants and their agents, coupled with the complete failure of Defendants to provide any positive medical treatment for Plaintiff, constitute a course of medical care so clearly inadequate as to amount to the refusal to provide medical care. Such acts were so blatantly inappropriate as to evidence intentional

maltreatment resulting in the deprivation of Plaintiff's quality of life in violation of the Fourteenth and Eighth Amendments to the United States Constitution.

52. The above alleged acts of the Defendants and their agents were of a malicious and intentional nature and manifest a deliberate indifference to requests for essential medical treatment.

## CLAIMS AGAINST STATE ACTORS

### COUNT I
### Harvey Broadus v. Prison Health Services, Inc. and Michael Herbik, M.D.

### Violations of 42 U.S.C. § 1983

53. All other paragraphs of this Complaint are incorporated herein by reference.

54. Plaintiff sues Defendant Herbik in his individual capacity only.

55. At all times relevant hereto, PHS and Defendant Herbik acted under color of state law.

56. PHS and Defendant Herbik were deliberately indifferent to Plaintiff's serious medical needs.

57. By their deliberate indifference to Plaintiff's serous medical needs, PHS and Defendant Herbik deprived Plaintiff of his right, guaranteed under the Eighth Amendment to the U.S. Constitution and made applicable to the states through the Fourteenth Amendment, to be free from cruel and unusual punishment.

WHEREFORE, Plaintiff Harvey Broadus demands compensatory and punitive damages against defendants PHS and Defendant Herbik jointly and severally for violations of 42 U.S.C. § 1983, plus costs, interest, attorney's fees, delay damages, and any and all other damages the court and/or fact finder deems appropriate.

## CLAIMS AGAINST PRISON HEALTH SERVICES

### COUNT II
### Harvey Broadus v. Prison Health Services, Inc. and Michael Herbik M.D.

### Negligence

58. All other paragraphs of this complaint are incorporated herein by reference.

59. Defendant PHS, and Defendant Herbik were under a duty to perform a complete workup of all inmates complaining of serious but undiagnosed medical symptoms and timely diagnose and treat serious medical conditions and needs and to render adequate medical assistance to all inmates.

60. Defendant PHS and Defendant Herbik breached these duties in the following particular respects:

    a. In failing to ever perform a complete history and physical exam of Plaintiff;

    b. In failing to ever apply the principles of differential diagnosis in their treatment of Plaintiff;

    c. In failing to timely diagnose and treat Plaintiff's ischemic limb;

    d. In failing to timely undertake diagnostic measures which would have definitely revealed Plaintiff's ischemic limb condition;

    e. In failing to take any steps to rule out that Plaintiff was suffering from an ischemic limb;

    f. In deliberately delaying the workup, diagnosis and treatment of Plaintiff's ischemic limb;

    g. In deliberately delaying Plaintiff's consultation to a vascular surgeon;

    h. In failing to timely respond to Plaintiff's September 11, 2014 Doppler study which definitively revealed a complete critical occlusion of his lower left arteries;

    i. In failing to recognize and respond to obvious signs of critical limb ischemia;

j. In failing to recognize profound arterial occlusion in Plaintiff's lower left extremity as an emergent condition;

k. In placing the cost of medical treatment ahead of complete and proper treatment of inmates in need of medical care for serious medical conditions, including Plaintiff;

l. In failing to undertake any meaningful workup of Plaintiff when Plaintiff exhibited obvious and concerning signs and symptoms of critical limb ischemia;

m. In failing to perform any meaningful diagnostic tests upon Plaintiff which would have timely revealed his critical limb ischemia; and

n. In failing to give any meaningful consideration of Plaintiffs physical findings and symptoms, which were highly indicative of critical limb ischemia.

61. As a direct and proximate result of the negligence of Defendant PHS and Defendant Herbik, Plaintiff was denied appropriate medical treatment which caused a significant delay in the diagnosis and treatment of his critical limb ischemia and in turn caused him need a below the knee amputation.

62. These acts were also intentional, willful, malicious and/or intended to cause serious injury to Plaintiff.

WHEREFORE, Plaintiff Harvey Broadus, demands compensatory and punitive damages against defendants PHS and Herbik, jointly and severally plus costs, interest, attorney's fees, delay damages, and any and all other damages the court and/or fact finder deems appropriate.

Respectfully submitted,

MEYERS EVANS LUPETIN & UNATIN, LLC

By: _____
Brendan B. Lupetin, Esquire
PA I.D. #201164

The Gulf Tower, Suite 3200
707 Grant Street
Pittsburgh, PA 15219
(412) 281-4100
blupetin@meyersmedmal.com

Attorneys for Plaintiff