Kennon Tubbs M.D.

13584 Carolina Hills Court

Draper Utah 84020

(801) 502-3473

29 December 2015

Brendan Lupetin

Meyers Evans & Associates, LLC

Gulf Tower

707 Grant Street Suite 3200

Pittsburgh, PA 15219

Dear Mr. Lupetin,

I have reviewed the 780 page medical record you have provided me on your client Mr. Harvey Broadus. Mr. Broadus underwent a below the knee amputation of his lower leg due to ischemia. The lack of blood supply to his leg allowed him to develop a cellulitis in his foot. The continued lack of blood supply and poor foot care allowed the infection to worsen and progress. This infection was allowed to continue without attempting to diagnose the underlying vascular disease. Through this poor choice in antibiotic therapy and lack of wound culture to attempt to diagnose the underlying pathogen the infection worsened. Reluctantly, subsequent gangrene infection set in. It was only at that time (27 days after the infection started) that the prison acted to aggressively treat his infection and attempt to improve his vascular supply to his limb. The infection was first noted on August 20th with a WBC of 10.95. Mr. Broadus was finally transferred to a hospital and seen by the vascular surgeon on September 17th.

Mr Broadus has 5 modifiable risk factors for peripheral artery disease. These include severe poorly controlled hypertension, poorly controlled diabetes, poorly controlled hyperlipidemia, severe smoking addiction, and obesity. The prison provided Mr. Broadus limited care to address these chronic issues over the 25 years of incarceration. The prison mismanaged and ignored Mr. Broadus' hypertension and failed to treat it in the 1990's and 2000's. Every blood pressure of Mr. Broadus taken on regular physicals was elevated though not addressed. His

1

diabetes hemaglobin A1C was 15 making his average blood glucose over 400 over a 3 month span. His lipids were over 400 on multiple occasions without follow up or concern. It is also apparent that the prison allowed inmates to continue a poor health practice of smoking and never offered any type of smoking addictio/cessation program to Mr. Broadus, though they document an astounding 60 pack per year history of smoking.

Peripheral vascular disease also has non modifiable risk factors. For Mr. Broadus this includes his age of 68, his race, and his sex - male.   Mr. Broadus was noted to have a septal infarct on his heart in 2011 on EKG that went unnoticed and ignored. This risk factor alone should have triggered a cardiology consult and vascular workup in the last 5 years. Mr. Broadus has all 9 major risk factors for peripheral vascular disease yet they were ignored by multiple providers at the prison for most of his prison career. He should have had - at minimum- a cardiology consult and closer monitoring of his risk factors long before his infection began.

Mr. Broadus's vascular disease was not diagnosed in a timely manner. He began complaining of leg pain and discomfort one year prior to his ischemia. A rheumatologist was consulted and Mr. Broadus was given pain management and a wheelchair but nothing was noted to include his vascular status of his extremities at that time despite his complaints of leg pain, claudication, and rest pain. Walking/exercise is the primary "A level recomendation" treatment for peripheral vascular disease not a wheelchair. Mr. Broadus records document rest pain and claudication symptoms one year prior to the event and abnormal leg findings on routine physical exam in 2012 that were documented but never given any follow up or concern noted about the abnormal findings.

The delay in diagnosis of his vascular disease and the lack of aggressive diabetic control predisposed this patient to a distal extremity infection.  The infection was first noted on August 20th and CBC labs were drawn showing an elevation in WBC. These labs were not signed off on by the provider until August 28th, 8 days later. On August 26th the nursing note by RN Durbin stated that Mr. Broadus' foot was **"COLD"** and that the **"MD was aware"**. On subsequent notes the patient was in the prison infirmary but no nursing notes state if his pulses were present, checked, or evaluated on August 25-29th. There are multiple statements that the foot was cold to touch but no pulse was checked by hand, ultrasound, or blood pressure cuff during these

2

visits. This inadequate and inproper nursing evaluation contributed to his delay in diagnosis. On August 30th a nurse first checked Mr. Broadus' pulses to determine that they were **"Thready"**. However, no immediate management was taken and a physician was not notified. The nurse decided to "continue to monitor pulses". The patient is seen by a physician on August 31st, eleven days after an infection in his foot began and after multiple complaints of severe pain. Though the physician assessment suspected vascular disease, no diagnostic studies or further care was ordered. Specifically, a bedside ankle brachial index was not done which would have been the standard of care for this type of evaluation. An Ultrasound or doppler study was not done. No increase in care was ordered at that time. These failures are uniformly overt deviations of the applicable standard of care.

In early September Mr. Broadus treatment staff neglected obvious warning signs of limb ischemia. Inexplicably, they elected to not send the patient emergently to the hospital for ischemia evaluation. This despite continued complaints of the patient, overwhelming risk factors for the disease, and worsening condition. The prison continued not to monitor Mr. Broadus' pulses in his distal extremity on a regularly scheduled program despite the question of vascular compromise. An ultrasound was not ordered until September 8th and not completed until September 12th, 2014- another critical delay in this patient's diagnosis. The patient at that time should have been sent to the nearest ER with the findings of limb ischemia on ultrasound but the doctors instead decided to continue to monitor the patient for five more days. During this time the pulses were not checked on a regular basis and the toe became **"mottled and fleeting pulses"**. This unfortunate finding finally triggered the treating physician to act and obtain an outside consult and emergency evaluation.

The first time the vascular status was aggressively addressed was on September 17th, 2014. By this time the foot was ischemic, blue, and Mr. Broadus was septic with a white blood cell count of 19,900 and a temperature of 101.1 F. All efforts were taken to save his leg at that late point in time but it was too far advanced to be salvaged.

**In summary, the correctional system overwhelmingly failed to diagnose and neglected to provide the following care to Mr. Broadus:**

1. Proper primary preventative medicine and care for peripheral vascular disease.

2. Proper nursing care of inpatient monitoring of the vascular status of a patient housed in the infirmary.

3. Proper consultation of cardiology for the treatment of a complicated hypertensive patient with obvious severe arterial risk factors.

4. Diagnostic evaluation of an ischemic limb in a timely manner.

5. Appropriate treatment for a distal extremity infection in a vascular compromised diabetic patient.

It is my opinion- to a reasonable degree of medical certainty- that the mismanagement of Mr. Broadus' risk factors, indifference to his continued pain complaints, and failure to treat his ischemia in an emergent way was the direct cause of the loss of his limb. This outcome should have been avoided if the proper care and diagnostic steps were taken. It is unfortunate that the negligence was very broad and extended throughout multiple providers and nursing staff who evaluated the patient at different times. This report is based on a medical record review only. The medical doctors and nurses were not interviewed or consulted.

Sincerely,

*[signature: Kennon C Tubbs]*

Kennon Tubbs MD

Medical Correctional Consultants